UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 25-cr-10273-NMG-1 |
| ZHENXING WANG, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM
AS TO DEFENDANT ZHENXING WANG**

The United States of America, by and through its undersigned counsel, hereby submits this sentencing memorandum for defendant Zhenxing Wang (the "defendant"). Over a roughly three-year period, the defendant participated in a scheme with multiple North Korean information technology ("IT") workers to obtain remote, pseudonymous employment with U.S. companies using false or stolen identities. The defendant's role was essential to the scheme's success. He operated the largest "laptop farm" of the five individuals recruited by related defendant Kejia Wang. That is, the defendant received and hosted laptop computers shipped by U.S. victim companies to his New Jersey residence and facilitated remote access to those laptops by North Korean IT workers pretending to be U.S. citizen employees. The defendant also established a U.S.-based front company, Independent Lab LLC, and corresponding financial accounts to facilitate the laundering of victim funds to overseas accounts. The defendant's actions threatened national security by enriching the North Korean government by more than $5 million and by providing unauthorized access to the computer systems and networks of U.S. companies. The defendant's actions further harmed more than 100 U.S. companies and the identities of more than 80 U.S. persons.

1

The United States respectfully recommends a sentence of 96 months imprisonment. The United States further recommends that the Court impose 36 months of supervised release, a special assessment of $200, and a money judgment in the amount of $200,000 (the amount the defendant was paid for his participation in the conspiracy). The requested sentence reflects the seriousness of the offense, affords adequate specific and general deterrence, protects the public, and avoids unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

## PROCEDURAL HISTORY

On June 26, 2025, a grand jury charged the defendant by indictment with Conspiracy to Commit Wire and Mail Fraud, in violation of Title 18, United States Code, Section 1349 (Count One); Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h) (Count Two); Conspiracy to Commit Identify theft, in violation of Title 18, United States Code, Sections 1028(a)(7) and (f) (Count Three); and Conspiracy to Damage Protected Computers, in violation of Title 18, United States Code, Section 371 (Count Four). In addition, four of the defendant's overseas co-conspirators were also charged with Conspiracy to Violate the International Emergency Economic Powers Act, in violation of Title 50, United States Code, Section 1705(a) and (c) (Count Five).

On January 7, 2026, the defendant entered a voluntary plea of guilty to Counts One and Two of the indictment pursuant to a plea agreement with the United States. ECF Nos. 29 and 30. Sentencing is scheduled to occur on April 14, 2026. ECF No. 31.

## RELEVANT FACTS

On April 7, 2026, the United States Probation Office ("Probation Office") issued a final Presentence Investigation Report (the "PSR") in which it provided a statement of the offense compiled from a statement of facts submitted by the United States and the evidence obtained

during its investigation. *See* PSR ¶¶ 9-48. Both parties agree with the factual findings and the calculation of the defendant's advisory sentencing guidelines as set forth in the final PSR. This memorandum summarizes those facts and highlights additional ones relevant to the Court's sentencing.

The government of the Democratic People's Republic of Korea ("DPRK" or "North Korea") has sponsored a variety of schemes to evade comprehensive U.S. and United Nations ("U.N.") sanctions and earn money for the regime, including remote IT worker schemes like the one in which the defendant participated. From in or around 2021, and continuing through in or around October 2024, the defendant, a U.S. citizen and resident of New Jersey, acted as a facilitator for multiple North Korean IT workers. Specifically, the defendant (1) hosted laptop computers belonging to U.S. victim companies at his New Jersey residences; (2) communicated directly with the North Korean IT workers and their managers using various electronic messaging applications; (3) facilitated remote access to victim laptops by overseas IT workers through remote access software and hardware devices; (4) established the U.S.-based front company Independent Lab LLC and corresponding financial accounts to facilitate the laundering of victim funds to overseas accounts, primarily located in China; and (5) transferred and caused to be transferred victims funds to accounts controlled by his overseas co-conspirators.

During the course of the scheme, the defendant's North Korean co-conspirators obtained remote IT work positions at more than 100 different U.S. companies using the stolen identities of at least 80 U.S. persons. By hosting a laptop farm, the defendant gave these North Korean co-conspirators unauthorized access to victim companies' systems, allowing them to perform work that the companies believed was being performed by U.S. employees. The scheme generated more than $5 million in revenue for that work, including work performed for the companies identified

3

in the indictment as Company A, Company B, Company C, and Company D. For his participation in the scheme, the defendant received at least $200,000, the majority of which was electronically transferred into his personal Chase Bank account.

The defendant's overseas co-conspirators included North Korean nationals. Related defendant Kejia "Tony" Wang ("Kejia"), charged separately by information (25-CR-10274-1), told investigators that he was introduced to the scheme by a high school classmate in China that Kejia knew was from North Korea, spoke Korean and Mandarin, and often told Kejia not to mention his "hometown" in North Korea because it was "very sensitive." During a trip to China in 2023, the classmate admitted to Kejia Wang that "he worked for a North Korean company" and that the Chinese companies the operated worked together with the North Korean company to "build up. . . IT team[s]. . . and. . . work remotely. According to Kejia, he (Kejia) did not share this information with the defendant.

The defendant's role in enabling this North Korean scheme ended when he was confronted by law enforcement. On October 10, 2024, the investigating agencies executed court-authorized searches of seven locations assessed to be laptop farms, including the defendant's 1 Lake Avenue apartment.[1] The search of the defendant's apartment resulted in the recovery of 18 victim company laptops and numerous TinyPilot Keyboard, Video, and Mouse ("KVM") devices.[2] Below is a photo

---

[1] The United States originally obtained a warrant for premises at 26 Judson Street, where the defendant had hosted laptops from approximately 2021 through October 2024. Three days prior to executing the search, agents observed the defendant moving boxes and other personal items from Judson Street to an apartment located at 1 Lake Avenue. Based on this information, the United States obtained a new warrant for the Lake Avenue property, which proved fruitful as described herein. Both premises are in the District of New Jersey.

[2] TinyPilot is a brand of KVM-over-Internet Protocol ("IP") devices. KVM-over-IP devices are pieces of hardware that allow users to remotely control a computer or server—specifically, the computer's keyboard, video, and mouse—over a network connection.

of some of the devices seized from the defendant's home. The TinyPilot KVM devices are circled in red. Each victim company laptop was labeled by number, enabling the defendant and his North Korean co-conspirators to keep track of and communicate about each device and associated personas and employers.



While the search was occurring, the defendant agreed to a voluntary interview, which was conducted in Mandarin and recorded. The defendant admitted to hosting laptops at his residences since at least 2022. He stated he was introduced to the scheme by Kejia, whom he had met approximately 15 years earlier. Typically, the defendant picked up the victim company computers from Kejia's residence or from a storage unit that Kejia rented, where Kejia stored computers and other equipment shipped by the victim companies. The defendant estimated he had collected computers from Kejia approximately 100 times. As of the date of the interview, the defendant stated he was managing between 15 and 20 computers and claimed he had been paid between

$1,000 and $4,000 per month for his services, depending on the number of computers he hosted. He denied receiving any money directly from U.S. companies.

The defendant denied knowing the true identities of his overseas co-conspirators, but admitted that he believed they were located in China and that he communicated with them regularly. The defendant stated that he communicated with the remote IT workers via a messaging app called Mattermost, primarily in a channel called "Deep Sea Luc." After receiving a laptop from Kejia, the remote IT workers provided the defendant with login credentials for that laptop via Mattermost. The defendant then logged into the computer and connected them to his wireless internet network. Investigators found two ledgers in the defendant's residence collectively containing login credentials (*i.e.*, usernames and passwords) for 250 victim company accounts. The defendant denied doing anything else with the computers, including downloading remote access software onto the computers or connecting them to external KVM devices, despite the fact that numerous KVM devices were connected to the laptops recovered from his home.

The defendant, with help from Kejia, had registered a sham IT development firm called Independent Lab LLC in May 2021, which held itself out as legitimate, U.S.-based IT firm. During the interview, the defendant admitted that Independent Lab LLC was his company "on paper." He claimed the company was set up so he could "sell things on Amazon." However, the government's investigation revealed that the company never sold anything, had employees, or conducted any business. Instead, the defendant's overseas co-conspirators used this sham company to obtain new jobs and open financial accounts. When the government separately interviewed Kejia, he explained that he had helped the defendant create Independent Lab LLC so the defendant could receive more money for laptops the defendant hosted *plus* a portion of the wages paid to the IT workers.

Review of the Independent Lab LLC's website revealed it had limited functionality (*i.e.*, not all hyperlinks worked) and all testimonials from supposed clients appeared to be either copied from legitimate websites or referenced work completed by other companies. During his interview, the defendant claimed that Independent Lab LLC was no longer active; however, the company's website (www.inditechlab.com) remained active until the FBI simultaneously executed a warrant to seize the domain on the date of the interview. The defendant also admitted to opening a Wise account for Independent Lab LLC, but he falsely claimed the account was no longer active.[3] The defendant admitted that the remote IT workers used this Wise account to receive payment from the U.S. companies who employed them. The defendant falsely denied logging into or using the Independent Lab LLC Wise account except for a handful of times in 2022; however, records indicate that the defendant logged into the Independent Lab LLC Wise account from his residence through 2024.

The defendant also falsely denied having a personal Wise account. When the interviewing agents opened the Wise app on the defendant's phone, the app displayed two available Wise accounts: one for "Independent Lab LLC" and another for "Zhenxing Wang." Despite this, the defendant denied knowing anything about the "Zhenxing Wang" account or "how it was possible" that the account appeared on his phone. Legal process to Wise showed transfers of at least $140,000 in victim funds sent to the defendant's personal Wise account. Legal returns from Chase Bank showed transfers totaling approximately $150,000 from the "Zhenxing Wang" and Independent Lab LLC Wise accounts into the defendant's personal Chase Bank account between 2021 and 2024.

---

[3] Wise is online money service business that enables users to send and receive money internationally.

Based on the defendant's multiple false and misleading statements during the interview, the interviewing agents confronted the defendant about his lack of candor. The defendant responded that "more than 90 percent I said was the truth," an admission that some of what he said to the agents was false.

Pursuant to the residential search warrant, the FBI seized the defendant's cell phone. Review of the defendant's cell phone revealed numerous communications with Kejia and others about the IT worker scheme. Generally, the defendant used the encrypted communication application WeChat to communicate with Kejia about the scheme, including about such matters as which victim company devices to connect, where to connect those devices, the use of TinyPilots and other means of remote access, and how to facilitate payments from victim companies to accounts that the defendant and Kejia controlled. The following are examples of such communications:[4]

**04/21/2023**

**KEJIA:**     Get another set of [TinyPilots] and send it to me tomorrow morning.
FedEx or UPS will do
Ship to CA
[Redacted Address] #206 Vista CA 92081 United States
[Individual B]
[Redacted Phone Number]

**06/01/2023**

**KEJIA:**     Busy? Can you take my three [TinyPilots] tonight? It's connected, help me send it to New York tomorrow morning

**KEJIA:**     [Individual A]

**KEJIA:**     [Redacted Phone Number]

---

[4] The communications described in this memorandum are machine translated excerpts of more extensive communications obtained through the government's investigation.

**KEJIA:**            [Redacted Address] Flushing NY 11358 United States

**10/29/2023**

**KEJIA:**            I'm in Shenyang

**DEFENDANT:**     Just forwarded you 2 wise emails. It's about the previous 2 that were problematic. One of them succeeded. Robert Lopez's one that didn't work out could be that the PDF didn't have enough information

**DEFENDANT:**     Wise to ask for this information, we should upload a green card or passport

**DEFENDANT:**     Robert Lopez's passport has been passed down, and all wise accounts will    not be blocked, but now Chris is in the process of emptying his wise accounts, so will it make wise more monitored?[5]

**05/21/2024**

**KEJIA:**            please don't setup any WiFi and don't try to install anydesk/rustdesk[6] when you setting up new laptops. We will setup [TinyPilots] for ALL new laptops and will setup WiFi from our side. Thanks

**05/23/2024**

**KEJIA:**            You might need to open this link to sign up first. https://mattermost.deepsealuc.com/signup_user_complete...

**KEJIA:**            Register on this website and download the software

**KEJIA:**            Re-apply for an email

---

[5] Robert Lopez is an often-used persona reflected in, among other places, shipping records seized from Kejia's residence, shipping labels found on packages in Kejia's storage unit, and electronic evidence obtained from Kejia's personal computer. Records from the defendant's Wise account show that a photograph of "Lopez's" passport was provided to Wise to support various deposits into the account that references Lopez. A query of the passport in Deptartment of State databases confirmed that the passport was fake.

[6] AnyDesk and RustDesk are software that allows user to access and control computers remotely. Recall that the defendant denied installing remote desktop software onto any victim company devices.

| KEJIA: | Don't use your real name |
|---|---|
| **KEJIA:** | DON'T USE DANNY EITHER |
| **KEJIA:** | My name is David, David |
| **DEFENDANT:** | My email is lukamogic[@]gmail.com |
| **KEJIA:** | Server URL: https://mattermost.deepsealuc[.]com<br>Display Name: Deep Sea |
| **KEJIA:** | What's your name? |
| **DEFENDANT:** | Luka |
| **KEJIA:** | We tried this for a week, stabilized it for a week, and then deleted Slack |

## ADVISORY SENTENCING GUIDELINES

The United States agrees with the Probation Office's calculation of the defendant's advisory sentencing guidelines range ("GSR") (PSR ¶ 96), summarized as follows:

| | |
|---|---|
| Offense level for the underlying offense (conspiracy to commit wire fraud and mail fraud), § 2S1.1(a)(1) | **31** |
| • Base offense level for underlying offense (wire fraud), § 2B1.1(a)(1) | • 7 |
| • Loss greater than $3,500,000 but less than $9,500,000, § 2B1.1(b)(1)(J) | • +18 |
| • Ten or more victims, § 2B1.1(b)(2)(A)(i) | • +2 |
| • Substantial part of scheme committed from outside United States, § 2B1.1(b)(10)(B) | • +2 |
| • Unauthorized transfer or use of means of identification unlawfully to produce or obtain other means of identification, § 2B1.1(b)(11)(C)(i) | • +2 |
| The defendant is convicted under 18 U.S.C. § 1956(h), § 2S1.1(b)(2)(B) | **+2** |
| Acceptance of responsibility, § 3E1.1 | **-3** |
| Zero-point offender, § 4C1.1 | **-2** |
| **Total Offense Level** | **28** |

The resulting offense level is 28, and the defendant is in criminal history category I. *Id*. ¶ 65, 69-70. Based on the foregoing, the advisory guidelines range is 78 to 97 months imprisonment.

10

### ANALYSIS OF FACTORS UNDER 18 U.S.C. § 3553

Based on the factors set forth in 18 U.S.C. § 3553(a), the United States recommends a sentence of 96 months imprisonment. This recommended sentence appropriately reflects and addresses the seriousness of the defendant's conduct, serves as a deterrent to other U.S.-based facilitators, and aligns with the statute's mandate that the "[C]ourt . . . impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

### A.  The Nature and Circumstances of the Offense Are Serious

The defendant and his co-conspirators defrauded at least 100 U.S. companies out of close to $5 million, by, among other means, stealing the identities of at least 80 U.S. persons, and the defendant's conduct was integral to the scheme's success. From in or around 2021 to October 2024, the defendant hosted hundreds of computers of U.S. victim company at his residence.

The defendant's conviction did not stem from a single, impulsive act. He took daily actions to keep the complex scheme in operation and took steps to hide the fraud from the U.S. victim companies. The defendant aided in the deception by hosting laptop computers in his home and enabling his overseas co-conspirators to remotely access the laptop computers by downloading, without authorization, remote desktop software and through hardware such as TinyPilot devices. According to his voluntary interview, the defendant picked up "hundreds" of computers from Kejia during the course of the conspiracy. Additionally, when his overseas actors were unable to remotely access a victim company laptop, due to the victim company's security control, the defendant shipped the computer to Dandong, China, as shown by the chats below. [7]

---

[7] Dandong is a city located in the Liaoning province of China that borders the northwestern corner of North Korea and has an important border crossing, the Sino-Korean Friendship Bridge, which connects Dandong, Chian to Sinuiju, North Korea.

11

**12/11/2023 1:57:26 PM**

**KEJIA**      These computers need to be sent back to China, and I'm looking for some headphones and other accessories tonight, and they all need them. Paste the computer's number on the computer and put it in the box.

**KEJIA**      After that, you take the headphones and send them back to China together, and I'll give you the address when I arrive

**DEFENDANT**  Eight banks in China have failed

**12/13/2023 3:06:27 PM**

**KEJIA**      1001, Block B, Phase I, Sun Building, No. 126, Binjiang Middle Road, Zhenxing District, Dandong City, Liaoning Province Huang Jingbin 17641562274

**KEJIA**      room NO.1001,Taiyang tower, Binjiangzhong Road NO.126, Zhenxing District, Dandong, Liaoning Province, China +8617641562274 Huang Jing Bin

**12/13/2023 9:30:38 PM**

**DEFENDANT**  But as soon as there is a customs matter, then I think that it is not only a tax matter, but also that these are computers, and the customs may have to check the rest inside, and if it cannot be successfully mailed to China, and then come back, it will have to go through the United States customs again, and the United States customs will check the rest again, and then check the owner of the computer...

Then, in May 2021, the defendant created a sham IT company, Independent Lab LLC to create the appearance of a legitimate U.S. business and open financial accounts used to launder the proceeds of the scheme. Collectively, the defendant's actions tricked unsuspecting victim companies into believing they had hired vetted contractors through a legitimate IT development company. In fact, the companies had hired an insider threat[8] working remotely from China or

---

[8] An "insider threat" is any person who has or had authorized access to or knowledge of an organization's resources, including personnel, facilities, information, equipment, networks, and systems.

North Korea, which caused the victim companies real damage as evidenced by the victim impact statements. Without his assistance, the defendant's co-conspirators would have been unable to obtain these jobs in the first place.

The defendant's conduct threatened U.S. national security. The defendant's overseas co-conspirators were North Korean nationals working to generate revenue that contributed to the North Korean weapons programs and other regime priorities, in violation of U.S. and U.N. sanctions. While the defendant was seemingly unaware of North Korea's involvement, at a minimum, the defendant knew that he was illegally facilitating employment for *Chinese* nationals not authorized to work in the United States, which itself presents a substantial cybersecurity and national security risk. In sum, the defendant's ignorance of his co-conspirators' North Korean nationality does not mitigate the deliberate steps he took to facilitate their employment at U.S. companies and the transmission of funds from Wise accounts he opened to accounts controlled by North Korean nationals. The serious nature of the defendant's offense calls for a proportionately serious sentence.

### B.  History and Characteristics of the Defendant

The defendant has no criminal history, and he has accepted responsibility for his crime. The defendant was born in China and has resided in the United States since 2008. Since immigrating, he has become a naturalized U.S. citizen. PSR at 3, 25. The final PSR describes a stable home life. However, the defendant made deliberate misstatements during his voluntary interview, even after his lack of candor was remarked upon by the interviewing agents, indicating a lack of regard for the seriousness of the offense. Additionally, prior to joining the conspiracy, the defendant was gainfully employed and financially secure, *see* PSR ¶¶ 87-91. Collectively, these

characteristics weigh against his acceptance of responsibility and reinforce the need for a proportionately serious sentence of imprisonment.

### C.   There is a Strong Need for General Deterrence

A serious sentence is necessary to promote respect for the law and deter others from participating in similar schemes. North Korean IT worker schemes would not be successful without U.S.-based facilitators, like the defendant, who willingly assist overseas remote IT workers by operating laptop farms, creating fictious front companies and associated financial accounts, defrauding U.S. companies through the use of false and fake identification documents, and pocketing substantial sums of money for their roles. A serious sentence in this case will deter others from enabling North Korean revenue generation that is a threat to the national security of the United States. Conversely, a sentence that is too lenient would convey the wrong message to both North Korean IT workers and current and future U.S.-based facilitators that this conduct is tolerated in the United States and worth the risk of being caught by U.S. law enforcement.

### D.   This Sentence Avoids Unwarranted Sentence Disparities Among Defendants

To the government's knowledge, this is the sixth case involving a U.S.-based enabler of North Korean remote IT workers that will have proceeded to sentencing after pleading guilty pursuant to a plea agreement.[9] The other five cases are:

- *United States v. Christina Chapman*, D.D.C. Crim. No. 24-220-RDM, Total Offense Level ("TOL"): 37; GSR: 210-262 mos.; and Sentence: 102 mos.;

- *United States v. Minh Phuong Ngoc Vong*, D.M.D. Crim. No. 24- 177-DLB, TOL: 20; GSR: 33-41 mos.; and Sentence: 15 mos.;

- *United States v. Alexander Paul Travis,* S.D.Ga. Crim. No. 25-00059-JRH-BKE, TOL: 14; GSR: 15-21 mos.; and Sentence: 12 mos.

- *United States v. Jason Salazar*, S.D.Ga. Crim. No. 25-00060-JRH-BKE,

---

[9] Related defendant Kejia Wang will be sentenced the day after the defendant's sentencing.

TOL: 16; GSR: 21-27 mos.; and Sentence: 3 years' probation; and

- *United States v. Audricus Phagnasay*, S.D.Ga. Crim. No. 25-00061-JRH-BKE, TOL: 18; GSR 27-33 mos.; and Sentence: 3 years' probation.[10]

In *Chapman*, a U.S.-based facilitator was sentenced to 102 months in prison. As compared to the defendant, Chapman facilitated fraud against as many as 300 employers, compared to the defendant's 100 employers, but generated a similar sum of revenue ($6.8 million at the time of indictment) that was funneled to the North Korean regime. Accordingly, much of the *Chapman* Court's reasoning is applicable to this case. As the Court there explained:

> Ms. Chapman knew what she was doing was wrong. She knew that she was assisting some enemy of the United States. It is not clear which enemy she thought, but she knew it was an enemy of the United States. She may have unwittingly gotten involved at first, but she—as she continued through this process she knew what she was doing was unlawful. And … the consequences of what she did are extremely serious. They were real live victims whose lives were affected by her conduct, companies who were affected by her conduct. And most significantly from my perspective, the North Korean government was benefitted by her conduct in a manner that was material. And whether she knew it was North Korea or not or thought it was China or Pakistan, she thought she was helping some enemy of the United States. And I do think that the national security consequences of this case and cases like it are extremely, extremely serious.

*Chapman* Sentencing Transcript, attached hereto as Attachment A, at 32–33. Although the Court found that Ms. Chapman was "genuinely remorseful" and "the likelihood of recidivism [was] extremely low," the Court nevertheless imposed a substantial sentence, saying: "courts are going to take this really, really seriously because the consequences to the safety of our nation are at issue here." *Id.* at 34.

*     *     *

---

[10] In February 2026, a court in the District of Columbia sentenced a foreign national for facilitating North Korean revenue generation through an online business that allowed the IT workers to buy or rent stolen or borrowed identities belonging to real individuals in order to obtain remote IT work. *See United States v. Oleksandr Didenko*, D.D.C. Crim. No. 24-261-RDM. There, the defendant pled guilty to conspiracy to commit wire fraud and aggravated identity theft in violation of 18 U.S.C. §§ 1349 and 1028A, respectively, and was sentenced to 60 months in prison total.

**CONCLUSION**

In sum, the seriousness of the defendant's conduct and the threat to the national security posed by schemes such as this one counsel in favor of a period of incarceration. The United States respectfully recommends the Court sentence the defendant, in light of all of the Section 3553(a) factors, to 96 months imprisonment, followed by 36 months of supervised release, a special assessment of $200, and a money judgment in the amount of $200,000.00.

This sentence appropriately balances the severity of defendant's actions—which were essential to the scheme's success—and the amount of money he fraudulently received against his apparent lack of knowledge of his co-conspirators' true nationality.

Respectfully submitted,

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION

LEAH B. FOLEY
UNITED STATES ATTORNEY

Date: April 7, 2026          By:    */s/ Gregory J. Nicosia, Jr.*
                                    GREGORY JON NICOSIA, JR.
                                    D.C. Bar No. 1033923
                                    Trial Attorney
                                    National Security Division
                                    U.S. Department of Justice
                                    950 Pennsylvania Avenue, NW
                                    Washington, DC 20530
                                    (202) 353-4273
                                    Gregory.Nicosia@usdoj.gov

                                    DAVID HOLCOMB
                                    Mass. Bar No. 694712
                                    Assistant United States Attorney
                                    District of Massachusetts
                                    One Courthouse Way, Suite 9200
                                    Boston, MA 02210
                                    (617) 748-3119
                                    David.Holcomb@usdoj.gov

16

**CERTIFICATE OF SERVICE**

I hereby certify that the above document was filed through the ECF system on March

April 7, 2026, and will be sent electronically to the registered participants as identified on

the Notice of Electronic Filing (NEF).

*/s/ Gregory J. Nicosia, Jr.*
GREGORY JON NICOSIA, JR.
D.C. Bar No. 1033923
Trial Attorney

17